O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| MEMORY LANE, INC., | CASE NO. SACV 11-00940-JLS (RNBx) |
|---|---|
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANTS'** |
| CLASSMATES INTERNATIONAL, INC., et al. | **MOTION FOR ATTORNEYS' FEES AND NON-TAXABLE COSTS** |
| Defendants. | **(Doc. 217)** |

## I. INTRODUCTION

Before the Court is a Motion for Attorneys' Fees and Non-Taxable Costs filed by Defendants Classmates, Inc. and United Online, Inc. (Mot., Doc. 217.) Plaintiff Memory Lane, Inc. opposed, and Defendants replied. (Opp'n, Doc. 224; Reply, Doc. 226.) The Court finds this matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15. Accordingly, the hearing set for May 9, 2014 at 2:30 p.m. is VACATED. Having considered the parties' briefing, the Court DENIES Defendants' Motion.

## II. BACKGROUND

Plaintiff Memory Lane, Inc. filed this action on June 23, 2011 against Defendant Classmates International, Inc. and Defendant Memory Lane, Inc., asserting claims for false designation of origin under the Lanham Act; violation of California Business & Professions Code section 17200; and common law unfair competition. (Compl., Doc. 1.)[1] Plaintiff's claims were premised on Defendants' use of its trademark, "MEMORY LANE." (*See, e.g.*, FAC ¶ 32.)

Defendants did not move for summary judgment. Instead, they filed several motions in limine, some of which the Court granted at the Final Pretrial Conference. (*See* Reply at 2; Doc. 150.) Defendants disclosed for the first time at the Final Pretrial Conference that they had stopped using the

---

[1] Plaintiff subsequently dismissed Classmates International and filed a First Amended Complaint adding United Online. (Doc. 18; First Am. Compl. ("FAC"), Doc. 30.) As discussed below, Defendant Memory Lane, Inc. changed its name to Classmates, Inc. shortly before trial.

2

"MEMORY LANE" mark. (Final Pretrial Conference Tr., 3:24-4:2, Doc. 148.)[2]

Following a five-day trial, the jury found that MEMORY LANE was a valid protectable mark in which Plaintiff owned rights, but that Plaintiff had not shown a likelihood of confusion among an appreciable number of consumers due to Defendants' use of the mark. (Doc. 196.) As a result, the jury found in favor of Defendants on all three claims. During the trial, Defendants moved for judgment as a matter of law on the grounds that Plaintiff had failed to prove a likelihood of confusion and that no reasonable jury could award damages. (Doc. 178.) The Court denied the motion. (Doc. 191.)

On March 11, 2014, Defendants filed the present Motion, seeking approximately $2.5 million in attorneys' fees and non-taxable costs. (Mot.; Robinson Decl. ¶¶ 41-42, Doc. 217-1.) Many of the arguments made in Defendants' Motion are similar to those made in Defendants' motion for judgment as a matter of law. (Mot.)

## III. LEGAL STANDARD

Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "[A]ttorney's fees under the Lanham Act may also include reasonable costs that the party cannot recover as the 'prevailing

---

[2] According to Plaintiff's counsel, this disclosure was "the first time that [he] heard about any of these changes" and "was giv[en] no notice from [Defendants' counsel] as to any of these changes." (*Id*. at 9:1-5.) It was also the first time the Court learned of the changes. (*See id*. at 4:15-20.)

3

party.'" *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co., Ltd.*, 668 F.3d 677, 690 (9th Cir. 2012).

In the context of the Patent Act, the Supreme Court recently held that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, --- S. Ct. ----, 2014 WL 1672251, at *5 (Apr. 29, 2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*.

In the context of the Lanham Act, the Ninth Circuit has noted that the line distinguishing exceptional cases from non-exceptional cases "is especially fuzzy where the *defendant* prevails due to plaintiff's failure of proof." *Secalt*, 668 F.3d at 687. However, "[a]n action may be considered exceptional [w]hen a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith." *Id*. (quotation marks omitted; second alteration in original). Fee shifting is not limited to such circumstances, however, and a case may also be considered "exceptional" "if the plaintiff has no reasonable or legal basis to believe in success on the merits." *Id*.; *cf. Octane Fitness*, 2014 WL 1672251, at *6 ("[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." (citing *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521, 526 (D.C. Cir. 1985) (interpreting Lanham Act))).

## IV. DISCUSSION

Defendants argue that this case is exceptional because Plaintiff's theory of liability was "baseless" and Plaintiff lacked any viable theory of relief. (Mot. at 2, 9.) The Court addresses each argument in turn, and finds that under the totality of the circumstances this case is not "exceptional."

### A. Plaintiff's Theory of Liability

Defendants argue this case was exceptional because there could not have been any likelihood of confusion under the *Sleekcraft* factors.[3] These factors include "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)). The test "must be applied in a flexible fashion," and some considerations may be more important than others based on the circumstances. *Id.*

The Court briefly discusses each factor, addressing only whether they support finding this case exceptional.

---

[3] Defendants do not argue the case was "exceptional" based on any other prerequisite for finding liability. Before reaching the issue of likelihood of confusion—for which the jury found in Defendants' favor—the jury found in Plaintiff's favor with respect to (1) whether MEMORY LANE was a valid protectable trademark; and (2) whether Plaintiff owned trademark rights in the mark. (Doc. 196.)

### 1. Strength of the Mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011). "Two relevant measurements are conceptual strength and commercial strength." *Id.*

As to conceptual strength, "MEMORY LANE" could be considered suggestive to the extent it "requires a mental leap from the mark to the product." *Id.* at 1150 (quotation marks omitted). As to commercial strength, Plaintiff provided evidence, among other things, that it (1) had been in business as Memory Lane for over a decade; (2) spent more than $3 million in advertising in recent years; (3) advertised in publications, on the radio, on the Internet, at trade shows, and through various other means; and (4) was repeatedly featured on television and in publications. (*See, e.g.*, Trial Tr. 43:20-21, 59:14-61:19, 63:8-64:8, 65:23-66:15, 67:7-71:6, 71:11-76:23, Trial Exs. 101, 103, 104, 106-09, 111-12, 139, 147, 169, 194).[4] The evidence demonstrated Plaintiff was not the only company to use "Memory Lane" for sports auctions, but these other companies were relatively small and insignificant. (*See, e.g.*, Trial Tr. 644-658, 722:16-21, 754-755:7, 782:1-5.); *cf. Rearden*, 683 F.3d at 1211 (mark not rendered weak where other companies in the same business using the same mark had headquarters in different states, lacked an Internet presence, and employed fewer than five people). In addition, the jury found that the mark was valid and

---

[4] Although this evidence does not always distinguish between the word mark in isolation and the word mark in connection with Plaintiff's logo, the Court does not find the issue material for purposes of this Order.

protectable. (Doc. 196.) Therefore, this factor does not support finding this case exceptional.

### 2. Proximity of Goods and Services

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Network Automation*, 638 F.3d at 1150 (quotation marks omitted). "The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Id.* Courts have taken a "flexible approach" to this factor. *Rearden*, 683 F.3d at 1212 (collecting cases). In the context of trademark infringement on the Internet, the proximity of goods factor has been considered "especially important." *Id.* at 1209.

Defendants offered nostalgia content on their "Memory Lane" website, while Plaintiff auctioned sports and other memorabilia through its "Memory Lane" website. (*See, e.g.*, Trial Tr. 36:3-19, 40:12-21, 342:4-7, 392:24-395:2.) In several instances, Defendants' "Memory Lane" site included images of items Plaintiff had sold. (*Id.* 85:9-90:6.) Although the businesses do not offer the same services, and they are not necessarily directed to the same consumers, their services could be considered complementary—one might see an image of memorabilia on Defendants' site and use Plaintiff's site to purchase the memorabilia. (*Cf.* Trial Tr. 285:14-21 (consumer visiting Defendants' site testified he assumed Defendants were in memorabilia business and that Plaintiff and Defendants were related).) Therefore, this factor does not support finding this case exceptional.

### 3. Similarity of Marks

"[T]he more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion." *Network Automation*, 638 F.3d at 1150 (quotation marks omitted). "Similarity of the marks is tested on three levels: sight, sound, and meaning. Each must be considered as they are encountered in the marketplace." *Id.* (quotation marks omitted). This factor has also been considered "especially important" in the context of trademark infringement on the Internet. *Rearden*, 683 F.3d at 1209.

The word marks used by each side are identical, and each side used the mark for essentially the same connotation. Although Plaintiff also used a logo, the use of identical or near-identical word marks can still weigh "significantly" in a plaintiff's favor despite "the parties' very different logos." *Id.* at 1211-12. In addition, the relative strength of the mark may lessen the impact of any differences between the parties' respective use of the mark. *See id.* at 1212. This factor does not support finding this case exceptional.

### 4. Actual Confusion

"[A] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." *Network Automation*, 638 F.3d at 1151 (quotation marks omitted).

Plaintiff provided evidence that it had received hundreds of emails and phone calls from Defendants' customers, who were trying to reach Defendants. The Court expressly held that "evidence of the misdirected communications is relevant to whether there's a likelihood of confusion." (Final Pretrial Conference Tr. 15:14-16); *see also Rearden*, 683 F.3d at 1217 (considering "dozens of misdirected emails actually intended for

[defendant], some of which were sent by [defendant's] own customers" as "evidence of actual consumer confusion"). Plaintiff also provided evidence that several of its customers, as well as several non-customers (such as the California Attorney General), confused Defendants with Plaintiff. (*See, e.g.*, Trial Tr. 140:24-141:7, 111:11-113:4, 256:7-257:19, 278:16-279:19, 285:14-21.) Defendants argue that Plaintiff's evidence does not demonstrate that any consumer changed their purchasing decisions, (Reply at 8-12), but evidence of actual confusion is not limited to direct evidence of consumers who changed their purchasing decisions. *See Rearden*, 683 F.3d at 1214-19. Defendants also argue that the number of people who were confused was relatively small. (Reply at 8-12.) However, even if Plaintiff failed to show actual confusion among a "significant" number of consumers, this would demonstrate only that the factor does not provide "*strong* support for the likelihood of confusion." *Network Automation*, 638 F.3d at 1151 (emphasis added; quotation marks omitted); *see also id.* ("[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act.") (quotation marks). Therefore, this factor does not support finding this case exceptional.

### 5. Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." *Id.* (quotation marks omitted). Here, the evidence demonstrates that Defendants advertised online and on television; Plaintiff also advertised online, as well as in print, at trade shows, and on the radio, with a focus on the collectibles market. (Trial Tr. 60:13-69:4, 150:20-151:1, 378:1-7, 409:3-11.)

Plaintiff argues that because "[b]oth parties' business are primarily internet businesses," "both parties have the same marketing and advertising channels." (Opp'n at 11.) The Ninth Circuit has pointed to "simultaneous use of Internet advertising" as one of the three factors that are "especially important in cases involving similar domain names." *Rearden*, 683 F.3d at 1209; *see also Network Automation*, 638 F.3d at 1148-49. However, the Ninth Circuit has also recognized that "'it makes no sense to prioritize the same three factors for every type of potential online or commercial activity.'" *Rearden*, 683 F.3d at 1209. at 1209-10 (quoting *Network Automation*, 638 F.3d at 1148-49). As such, in a case involving the use of another's trademark as a search engine keyword, the Ninth Circuit has found that the fact that both parties advertised online "does not shed much light of the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1148, 1151 (citing *Playboy Enterps., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight.")).

In light of the above facts and law, Plaintiff could reasonably argue this factor weighs in its favor; Defendants likewise could reasonably argue that this factor weighs in *their* favor, or is of little weight. Accordingly, this factor does not support finding this case exceptional.

### 6.     Type of Goods and Degree of Care

"Low consumer care . . . increases the likelihood of confusion." *Network Automation*, 638 F.3d at 1152 (quotation marks omitted). Plaintiff "for the most part" sold items between $500-$1500, although it also sold items for as low as $5. (Trial Tr. 40:12-17.) In cases where consumers

exercise varying degrees of care, the Ninth Circuit has noted two possible approaches: (1) use the standard of care of the least sophisticated customer, or (2) use a weighted average of the different levels of purchaser care. *See Brookfield Comm's, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999). It is not necessary for the Court to decide which test should apply; the Court merely notes that one test would favor Plaintiff, while the other would favor Defendants. As such, this factor does not warrant finding this case exceptional.

### 7. Defendants' Intent

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Network Automation*, 638 F.3d at 1153 (quotation marks omitted). This factor is relevant "only insofar as it bolsters a finding that the use of the trademark serves to mislead consumers rather than truthfully inform them of their choice of products." *Id*.

Among other things, Plaintiff provided evidence that (1) its business appeared in Defendants' trademark search, demonstrating Defendants' awareness of Plaintiff's prior use of the mark; (2) Defendants' CEO sent an internal email regarding Plaintiff's prior use of the mark; (3) two business days after the email was sent Defendants anonymously registered fifteen domain names with the words "memory lane auction[s],"[5] despite the fact that they were not in the auction business; and (4) Defendants disregarded

---

[5] For example, "memorylaneauctions.com," "memorylaneauction.com," "memory-lane-auctions.com," "memory-lane-auction.com," "memorylane-auction.com." (Trial Ex. 25-001.)

Plaintiff's cease and desist letter and a letter Plaintiff sent to Defendants identifying alleged instances of actual confusion. (Trial Tr. 101:22-104:11, 318:21-25, 366:19-21, 336:4-17, 364:3-5, 366:12-367:10; Trial Exs. 8, 23, 25.) In light of Plaintiff's evidence, this factor does not support finding this case exceptional.

### 8. Likelihood of Expansion

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Network Automation*, 638 F.3d 1153 (quotation marks omitted).

Defendants apparently considered expanding their site to include mass-merchandise or sports memorabilia.[6] However, Defendants announced for the first time at the Final Pretrial Conference that they had shut down their Memory Lane website. (Final Pretrial Conference Hr'g Tr. 3:21-5:3, 9:1-5.) The fact Defendants may have caused this factor to tip in their favor on the eve of trial does not support finding this case exceptional.

### 9. Conclusion as to Plaintiff's Theory of Liability

None of the individual *Sleekcraft* factors support finding this case exceptional. As such, they do not support finding this case exceptional

---

[6] Plaintiff's citations to the record for this point do not support their contention that Defendants considered selling sports memorabilia, (Opp'n at 5, 12), but the point is not directly disputed by Defendants, either. (*See* Reply at 7 ("Thus even if Defendants had sold mass-merchandise as was briefly contemplated . . .").) The Court notes that at trial, Defendants represented they "tried" to sell products other than yearbooks, which they were already selling. (Trial Tr. 395:5-8.)

when considered together, either.  Moreover, as noted above, the jury found Plaintiff owned a valid protectable mark.  As such, Plaintiff's theory of liability does not support finding this case exceptional.

### B. Plaintiff's Claims for Relief

Defendants also argue that Plaintiff had no basis for the relief it requested, and therefore this case is exceptional.  (Mot. at 9-20.)  The relief sought by Plaintiff included an injunction, corrective advertising costs, Defendants' profits, and a reasonable royalty.  Considered as a whole, Plaintiff's claims for relief do not support finding this case exceptional.

Defendants argue that it was unreasonable for Plaintiff to seek an injunction after it learned that Defendants' "Memory Lane" website was not profitable, and after Defendants "formally told" Plaintiff for the first time at the Final Pretrial Conference that they had "completely eliminated [their Memory Lane] website" and changed their name from Memory Lane, Inc. to Classmates Inc.[7]  (Mot. at 10.)  The fact that Plaintiff continued to pursue an injunction in light of these disclosures does not support finding this case exceptional.  *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986) (reversing district court's refusal to grant permanent injunctive relief where defendant claimed to have stopped infringing); *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984) (affirming grant of preliminary injunction in trademark case despite the fact that "[defendant] had voluntarily stopped using the disputed term").

---

[7] As of the date of Plaintiff's Opposition, Defendants' applications to register "MEMORY LANE" and "MEMORYLANE.COM" with the U.S. Patent & Trademark Office remained pending.  (Keith Wesley Decl. Exs. C-F, Doc. 225.)

13

With respect to disgorgement of profits, Defendants particularly take issue with Plaintiff seeking Defendants' total profits, as opposed to any specifically related to Defendants' "Memory Lane" nostalgia website. (Mot. at 18; Reply at 14-17.) "The plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity *with reasonable certainty*." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993) (emphasis added). "The defendant thereafter bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity . . . ." *Id.*; *see also Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994) ("[T]he burden is upon [defendant] to prove that sales were demonstrably not attributable to the infringing mark.") (alterations in original; quotation marks omitted); 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:65 (4th ed.). Moreover, "where infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to a plaintiff." *Nintendo*, 40 F.3d at 1012. Here, Plaintiff put forth evidence that (1) Defendants' "Classmates" web pages used the MEMORY LANE mark; (2) Classmates' corporate name was changed to Memory Lane, Inc.; (3) Defendants publicized that "Classmates is now part of Memory Lane;" and (4) following the introduction of Defendants' "Memory Lane" website and related advertising, traffic increased to Defendants' sites and Defendants' net subscriber loss slowed. (Trial Tr. 327:13-15, 378:11-379:9, 614:24-617:5, 612:4-17; Trial Exs. 33, 48-004, 48-005, 67-004, 67-001, 67-013.) Based on this evidence and precedent, it was not unreasonable for Plaintiff to seek the profits that it did, based either on the grounds that such profits could be attributed with reasonable certainty to allegedly infringing activity, or because allegedly infringing and non-infringing activity could not be

1 readily separated.  Defendants argue that they demonstrated that the profits
2 Plaintiff sought were not attributable to Defendants' use of the mark, as was
3 their burden.  (Mot. at 19.)  The fact that Plaintiff did not do so for
4 Defendants does not make this case exceptional.

5 With respect to a reasonable royalty, Defendants argue that it was
6 improper for Plaintiff to seek such a royalty without any prior licensing
7 history.  (Mot. at 12-15.)  Some courts, however, have allowed a reasonable
8 royalty even without prior licensing.  *See, e.g.*, *QS Wholesale, Inc. v. World
9 Marketing, Inc.*, No. SA 12-cv-0451 (RNBx), 2013 WL 1953719, at *4
10 (C.D. Cal. May 9, 2013) (collecting cases).  In addition, Defendants' own
11 expert testified that Plaintiff may be entitled to a reasonable royalty if
12 Defendants were found liable.  (Trial Tr. 869:21-25.)  Further, while
13 Defendants argue that Plaintiff's proposed 4% royalty rate used was
14 unsupported, (Mot. 15), Defendants fail to address all of the evidence put
15 forth by Plaintiff, including testimony that the royalty rate for Defendants'
16 CLASSMATES mark[8] was 4%, based on Defendants' own valuations.  (*See*
17 Trial Tr. at 500:19-502:20.)  Finally, Defendants argue that Plaintiff's use of
18 their total profits as a royalty base was "grossly improper."  (*See* Reply at
19 17-18.)  For the reasons stated above, this does not support fining this case
20 exceptional.

21 With respect to corrective advertising, Defendants argue that Plaintiff
22 either had no evidence of harm, or that its evidence of harm did not justify
23 the amount of the award it sought.  (Mot. 10- 13; Reply at 18-19.)  The
24 Ninth Circuit has upheld an award of damages based in part on corrective

---

[8] As noted above, the Classmates service operated under the name Memory Lane for a period of time. (Trial Tr. 327:13-15; *see also* Trial Exs. 33, 67-004, 67-011, 67-013.)

15

advertising where the plaintiff provided evidence of (1) its expenditures on advertising and building its reputation; (2) the "widespread harm" to its reputation, based on "multiple declarations and witness testimony proving that customers were very angry with, and blamed [plaintiff] for, problems caused by [defendant];" and (3) the need for corrective advertising. *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1112-13 (9th Cir. 2012). Here, Plaintiff presented evidence how much it spent on advertising, how much Defendants spent advertising the launch of their Memory Lane service, and how much Defendants spent on "online acquisition and other marketing" for "the entirety of the Classmates/Memory Lane business." (Trial Tr. 515:11-23, 517:9-518:2, 519:2-16.) Plaintiff then asked the jury to come up with a damages figure, which was not an unreasonable request. *See Skydive Arizona*, 673 F.3d at 1112. Plaintiff also put forth evidence that it received hundreds of misdirected consumer complaints intended for Defendants. Whether or not such evidence persuasively demonstrated harm, it does not warrant finding this case exceptional.

### V. CONCLUSION

Under the totality of the circumstances, neither Plaintiff's theory of liability nor its claims for relief "stand out" for their lack of merit, and there was nothing "unreasonable" about the manner in which Plaintiff litigated the case. As such, the Court does not find this case "exceptional" under section 35(a) of the Lanham Act, and Defendants' Motion is DENIED.

**SO ORDERED:**

DATED: May 8, 2014   JOSEPHINE L. STATON
                     HONORABLE JOSEPHINE L. STATON
                     UNITED STATES DISTRICT JUDGE